FILED
2026 Sep-15 PM 03:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| LAKEISHA ELLICK,<br><br>Plaintiff,<br><br>v.<br><br>SOCIAL SECURITY ADMINISTRATION, COMMISSIONER<br><br>Defendant. | ) | Case No. 2:25-cv-00584-NAD |

**MEMORANDUM OPINION AND ORDER**
**AFFIRMING THE DECISION OF THE COMMISSIONER**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Lakeisha Ellick appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on her claims for supplemental security income (SSI) and disability insurance benefits (DIB). Doc. 1. Plaintiff Ellick initially applied for benefits with an alleged onset date of September 13, 2023 (Doc. 8-5 at 29, 30), but later amended her alleged onset date to December 27, 2023 (Doc. 8-3 at 23, 54). The Commissioner denied Ellick's claim for benefits. Doc. 8-3 at 41. In this appeal, the parties consented to magistrate judge jurisdiction. Doc. 12; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUE FOR REVIEW

In this appeal, Ellick argues that the Administrative Law Judge (ALJ) did not apply correct legal standards, and that the ALJ's determination regarding Ellick's residual functional capacity (RFC) is not supported by substantial evidence. Doc. 15 at 6–15.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To qualify for disability benefits, a claimant must show disability, which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505.

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council.

*See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

> (1) whether the claimant is engaged in substantial gainful activity;
>
> (2) if not, whether the claimant has a severe impairment or combination of impairments;
>
> (3) if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;
>
> (4) if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and,
>
> (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018)

(quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

**STANDARD OF REVIEW**

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835,

838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion." *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. And the Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## BACKGROUND

### A. Procedural background

On October 6, 2023, Ellick applied for supplemental security income (SSI), and on October 31, 2023, Ellick applied for disability insurance benefits (DIB). Doc. 8-5 at 29, 30. Ellick initially alleged a disability onset date of September 13, 2023. Doc. 8-5 at 29, 30.

Ellick's applications were denied at the initial level (and on reconsideration). Doc. 8-5 at 52, 55, 68, 82. Following the initial denial of her claims, Ellick requested a hearing before an ALJ. Doc. 8-6 at 41. After Ellick agreed to appear by telephone (Doc. 8-3 at 33), the ALJ held a telephonic hearing on January 13, 2025. Doc. 8-3 at 23. At the hearing, Ellick amended her alleged onset date of disability to December 27, 2023 (Doc. 8-3 at 23, 54). On January 23, 2025, the ALJ issued an unfavorable decision. Doc. 8-3 at 41.

The Appeals Council denied Ellick's request for review. Doc. 8-5 at 23. Because the Appeals Council found no reason to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner on February 21, 2025. Doc. 8-3 at 2; *see* 42 U.S.C. § 405(g).

### B. Factual background and ALJ hearing

Ellick was born on July 21, 1977. Doc. 8-3 at 83.

On December 27, 2023, Ellick presented to Complete Health – Alabama for

systemic lupus erythematosus. Doc. 8-11 at 11. Ellick reported "increasingly difficult status with skin sores and associated symptoms." Doc. 8-11 at 16. Ellick reported "trouble with aspects of dressing at times and a young adult daughter has to help her including missing work herself." Doc. 8-11 at 16. Ellick appeared healthy, well-nourished, and well-developed, alert, and with normal mood. Doc. 8-11 at 16. Ellick was in no acute distress and ambulated normally. Doc. 8-11 at 16. During this visit, Ellick asked Dr. Morgan "to do FMLA attestation for [Ellick's] daughter in terms of the work effect on assistance for [Ellick]." Doc. 8-11 at 16; *see* Doc. 8-11 at 52.

On January 19, 2024, Ellick presented to Brookwood Baptist Medical Center following a motor vehicle accident. Doc. 8-12 at 6. Ellick complained of neck pain and anterior chest wall pain. Doc. 8-12 at 6. Ellick was able to move all extremities, with 5 out of 5 strength bilaterally. Doc. 8-12 at 7. X-rays showed no fracture or acute process, with moderate C5-6 disc height loss and otherwise mild cervical degenerative spondylosis. Doc. 8-12 at 8. Ellick was diagnosed with acute cervical myofascial strain and contusion of chest wall. Doc. 8-12 at 8.

On January 26, 2024, Ellick presented to Complete Health – Alabama for systemic lupus erythematosus. Doc. 8-13 at 83. Ellick reported "a difficult status in terms of systemic lupus erythematosus with continued problems in hands including arthritis and rash." Doc. 8-13 at 88. Ellick reported a rash on her heels

and toes and other sole areas and reported that she could not wear covered shoes. Doc. 8-13 at 88. Ellick reported having been in a motor vehicle accident on January 19, 2024. Doc. 8-13 at 88. Ellick appeared healthy, well-nourished, and well-developed. Doc. 8-13 at 88. Ellick was in no acute distress and ambulated normally. Doc. 8-13 at 88. Ellick "look[ed] well with appropriate concern[] but not uncontrolled toxicity or mental status abnormality in regular conversation." Doc. 8-13 at 89.

On February 5, 2024, Ellick presented to Complete Health – Alabama for a follow-up appointment after her motor vehicle accident. Doc. 8-13 at 75. Ellick was assessed for worsening lupus symptoms, and was awaiting approval for infusion. Doc. 8-13 at 81. Ellick was alert, cooperative, and in no distress. Doc. 8-13 at 81. Ellick's physical exam was normal, with the exception of faint expiratory wheeze in her upper lungs and mild neck pain. Doc. 8-13 at 81.

On March 1, 2024, Ellick presented to Complete Health – Alabama for an annual wellness visit. Doc. 8-13 at 66. Ellick underwent a health risk assessment, where she reported that she could shop, do housework, eat, cook, walk, bathe, and dress independently. Doc. 8-13 at 71. Ellick reported often feeling dizzy or falling when standing up, and that she always felt tired and fatigued. Doc. 8-13 at 71. Ellick reported that she had not felt anxious, depressed, irritable, sad, or downhearted and blue during the previous four weeks. Doc. 8-13 at 71. Ellick reported that she could

do "very heavy" physical activity for at least two minutes. Doc. 8-13 at 71.

On March 8, 2024, Ellick was admitted to Brookwood Baptist Medical Center with complaints of abdominal pain and upper pelvic pain. Doc. 8-12 at 27. Ellick reported that her pain was "wrapping around to her lower back and down both legs." Doc. 8-12 at 27. A CT scan of Ellick's abdomen and pelvis showed extensive retroperitoneal and pelvic adenopathy and cirrhotic morphology of the liver. Doc. 8-12 at 30–31. A CT scan of Ellick's chest showed thoracic lymphadenopathy within the axillary, retropectoral, mediastinal, hilar, and supraclavicular nodal chains, small right greater than left layering pleural effusions with adjacent subsegmental compressive atelectasis, and a moderate-sized sliding-type hiatal hernia. Doc. 8-2 at 36–37. Ellick was discharged on March 28, 2024. Doc. 8-12 at 54.

On March 15, 2024, Ellick had a telehealth psychological evaluation with Olympus Health. Doc. 8-13 at 90. Ellick's movements were within normal limits. Doc. 8-13 at 90. Ellick reported depressed mood, sadness, crying spells, isolation, fluctuating sleep, low energy, lack of motivation, difficulty concentrating, easy distraction, constant worry, low self-worth, helplessness, hopelessness, and easy irritation. Doc. 8-13 at 90. Ellick reported that she spent most days trying "to get up and clean her home and cook a meal." Doc. 8-13 at 93. Ellick reported that, on bad days, she "is in bed all day and she may get up at 3/4pm." Doc. 8-13 at 93.

Ellick reported that she was capable of using a phone/computer, cooking, doing laundry, washing dishes, driving, shopping, vacuuming, sweeping, and caring for pets. Doc. 8-13 at 93. Ellick reported that, on her bad days, her husband and daughter complete those tasks. Doc. 8-13 at 93. Ellick was found to be capable of attending to all activities of daily living on her own, was able to get along with others, and had no difficulty interacting with the provider during the exam. Doc. 8-13 at 94. Ellick was found to have no difficulty understanding, retaining, and following instructions or in relating to others. Doc. 8-13 at 99. Ellick was found to have mild difficulty sustaining attention to perform simple, repetitive tasks and to tolerate the stress/pressures associated with day-to-day work activity. Doc. 8-13 at 99.

On March 21, 2024, Ellick was admitted to Brookwood Baptist Medical Center. Doc. 8-13 at 15. Ellick reported worsening abdominal pain and nausea. Doc. 8-13 at 15. Ellick was discharged on March 22, 2024. Doc. 8-13 at 38.

On May 31, 2024, Ellick underwent a consultative examination with Tayla Washington, NP. Doc. 8-13 at 107–09. Ellick complained of frequent pain in her arms and legs and lupus flare-ups one to two times per week that cause painful sores. Doc. 8-13 at 107. Ellick complained of joint pain in her hands and knees, and she ambulated with a cane. Doc. 8-13 at 107. Ellick had difficulty sitting up and standing up from a seated position. Doc. 8-13 at 107. Ellick had "generalized

scarring" on her arms and her stomach due to sores during lupus flare-ups. Doc. 8-13 at 108. Ellick reported that she could walk half a block and could stand for 10 minutes if she was not in pain. Doc. 8-13 at 107. Ellick reported that she could lift a gallon in each arm, as long as she was not having a flare-up, and that she could climb 10 stairs. Doc. 8-13 at 107. Ellick appeared alert, oriented, and in no acute distress, and she could get on and off the examination table without problem. Doc. 8-13 at 108. Ellick had normal muscle, strength, and tone. Doc. 8-13 at 108.

On July 9, 2024, Ellick presented to Complete Health – Alabama for a follow-up appoint for systemic lupus erythematosus. Doc. 8-18 at 16. Ellick reported "difficult status with systemic lupus erythematosus." Doc. 8-19 at 2. Ellick reported fever, night sweats, weight gain, exercise intolerance, dry eyes, dry mouth, chest pain on exertion, shortness of breath, cough, wheezing, change in appetite, muscle aches, muscle weakness, joint swelling, joint pain, back pain, itching, dry skin, rashes, weakness and numbness, depression, sleep disturbances, and fatigue. Doc. 8-19 at 2. Ellick appeared healthy, well-nourished, well-developed, and in no acute distress. Doc. 8-19 at 2. Ellick ambulated normally. Doc. 8-19 at 2.

On July 10, 2024, Ellick presented to Complete Health – Alabama for a checkup. Doc. 8-18 at 6. Ellick reported pain in her left calf while walking and paresthesias in her left 4th and 5th toes. Doc. 8-18 at 13. Ellick was alert, cooperative, and in no distress. Doc. 8-18 at 14. Ellick's extremities were normal,

with no edema, but the pulse in her left foot could not be palpated. Doc. 8-18 at 14.

On July 29, 2024, Ellick saw Dr. Robert Scott McCord for left foot pain that "awakens her from sleep every night." Doc. 8-13 at 119. Ellick also complained of left calf discomfort with ambulation. Doc. 8-13 at 119. Ellick was assessed for atherosclerosis of native arteries of extremities with left leg pain. Doc. 8-13 at 121.

On August 19, 2024, Ellick presented to Complete Health – Alabama. Doc. 8-17 at 16. Ellick reported congestion and a cough. Doc. 8-18 at 3. Ellick reported lip swelling and eye swelling. Doc. 8-18 at 3. Ellick appeared alert, cooperative, and in no distress. Doc. 8-8 at 14.

On September 12, 2024, Ellick presented to Complete Health – Alabama for a follow-up appointment after Ellick visited the emergency room for gastrointestinal problems. Doc. 8-17 at 7, 14.

On September 13, 2024, Ellick again presented to Complete Health – Alabama for a follow-up appointment after Ellick visited the emergency room for gastrointestinal pain. Doc. 8-16 at 20.

On October 3, 2024, Ellick presented to Complete Health – Alabama for a follow-up appointment. Doc. 8-16 at 11. Ellick reported fever, night sweats, weight gain, and exercise intolerance. Doc. 8-16 at 18. Ellick also reported dry mouth, dry eyes, cough, wheezing, shortness of breath, change in appetite, muscle aches, muscle weakness, joint swelling, back pain, rashes, itching, dry skin, weakness, numbness,

depression, sleep disturbances, and fatigue. Doc. 8-16 at 18. Ellick appeared healthy, well-nourished, and well-developed. Doc. 8-16 at 18. Ellick was in no acute distress and was ambulating normally. Doc. 8-16 at 18.

On October 9, 2024, Ellick presented to Complete Health – Alabama for systemic lupus erythematosus. Doc. 8-16 at 3. Ellick reported sinus problems and a sore throat. Doc. 8-16 at 10. Ellick denied fever, chest pain, cough, rashes, fatigue, and muscle aches. Doc. 8-16 at 10. Ellick appeared alert, cooperative, and in no distress. Doc. 8-16 at 10.

On October 14, 2024, Ellick presented to Complete Health – Alabama for a blood pressure check. Doc. 8-15 at 13. Ellick reported elevated blood pressure and headaches. Doc. 8-15 at 21. Ellick appeared alert and oriented and in no acute distress. Doc. 8-15 at 21.

On November 6, 2024, Ellick presented to Complete Health – Alabama for an infusion. Doc. 8-15 at 5. Ellick received an infusion of Saphnelo for her systemic lupus erythematosus. Doc. 8-15 at 12.

On December 4, 2024, Ellick presented to Complete Health – Alabama for another infusion. Doc. 8-14 at 22. Ellick received an infusion of Saphnelo for her systemic lupus erythematosus. Doc. 8-15 at 4.

On December 9, 2024, Ellick presented to Complete Health – Alabama for a general follow-up appointment. Doc. 8-14 at 11. Ellick reported that her pain was

a 10 out of 10 on the pain scale. Doc. 8-14 at 11. Ellick reported episodes of nausea and vomiting and pain on the right side of her chest. Doc. 8-14 at 19. Ellick appeared alert, oriented, and in no acute distress. Doc. 8-14 at 19.

On January 13, 2025, the ALJ held a telephonic hearing on Ellick's applications for benefits. Doc. 8-3 at 50. At the hearing, Ellick amended her alleged onset date to December 27, 2023. Doc. 8-3 at 54.

Ellick testified that she ambulates with a cane that was prescribed from a previous rheumatologist. Doc. 8-3 at 51. Ellick testified that she uses the cane "around the house" on a regular basis, due to poor circulation in her legs. Doc. 8-3 at 52.

Ellick also testified that she was diagnosed with fibromyalgia, Sjogren's syndrome, and rheumatoid arthritis by a previous rheumatologist. Doc. 8-3 at 52–53. Ellick testified that her current rheumatologist does not treat her for fibromyalgia. Doc. 8-3 at 53.

Ellick testified further that she used marijuana weekly for around one month to help with pain, but that she stopped using marijuana "about five to eight months" prior to the hearing. Doc. 8-3 at 56.

Ellick testified that she worked in the Amazon warehouse in Bessemer, Alabama, in 2020. Doc. 8-3 at 58. Ellick testified that she climbed stairs and ladders to place products for packaging. Doc. 8-3 at 58–59.

Ellick also testified that she worked at Target in 2020, picking up products and taking them to the back of the store for packing, boxing, and loading onto a truck. Doc. 8-3 at 59. Ellick testified that the packages at Target sometimes ranged from 75 to 120 pounds. Doc. 8-3 at 59–60. Ellick testified that Target "knew [her] situation" and would "try to accommodate [her]," but that she still had to lift heavy items. Doc. 8-3 at 63. Ellick testified that she also worked as a cashier for Target for "three months at most." Doc. 8-3 at 62–63.

Ellick testified further that she worked for HRB Green Resources, or H&R Block, to learn how to be a tax preparer. Doc. 8-3 at 60. Ellick testified that when she had flare-ups, it was "hard for [her] to concentrate" because she "had to get up from the table to excuse [herself] from the clients . . . until [she] had to get up and walk away because the pain would hurt so bad." Doc. 8-3 at 61.

Ellick testified that for "two weeks at the most" out of one month, she is unable to perform her daily activities due to lupus flare-ups. Doc. 8-3 at 70. Ellick then testified that she was "down the whole month [of December] due to the lupus flare-ups, the sores, the feet" and was not "able to even take care of [herself]." Doc. 8-3 at 70.

Ellick also testified that there are "eight to ten days out of the month" where she is "bedbound." Doc. 8-3 at 71. Ellick testified that she has joint pain in her legs and her back is inflamed. Doc. 8-3 at 71. Ellick testified that lupus affects her whole

body, including her legs, arms, and chest. Doc. 8-3 at 71. Ellick testified that she has severe chest pains and her head and body can be covered in sores. Doc. 8-3 at 71.

Ellick testified further that her doctors have prescribed "a lot of creams" and "some topical solution" to place on her body, hands, and head to help with lupus symptoms. Doc. 8-3 at 72.

Vocational Expert (VE) Don Stephens testified that a hypothetical individual with Ellick's age, education, work experience, and the limitations posed by the ALJ could perform jobs that exist in significant numbers in the national economy. Doc. 8-3 at 64–69.

**C. ALJ decision**

On January 23, 2025, the ALJ issued an unfavorable decision. Doc. 8-3 at 23–41. In the decision, the ALJ concluded that Ellick "has not been under a disability, as defined in the Social Security Act, from December 27, 2023, through the date of this decision." Doc. 8-3 at 41.

The ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Winschel*, 631 F.3d at 1178). Doc. 8-3 at 25–26. The ALJ found that Ellick has not engaged in substantial gainful activity since December 27, 2023, the amended alleged onset date. Doc. 8-3 at 27. The ALJ found that Ellick had the severe impairments of spine disorder, connective tissue disorders, chronic

liver disease, depression, and anxiety. Doc. 8-3 at 27.

As to Ellick's medically determinable impairments, the ALJ found that Ellick had the non-severe impairments of hypothyroidism, hypertension, asthma, peripheral vascular disease, and marijuana use. Doc. 8-3 at 27.

The ALJ found that, while Ellick alleged fibromyalgia, the Social Security Administration requires "evidence of widespread pain in all four quadrants of the body and evidence that other disorders that could cause the claimant's symptoms or signs have been excluded." Doc. 8-3 at 27–28. The ALJ found that while Ellick's "rheumatology records show a past diagnosis of fibromyalgia . . . there is no evidence that [Ellick] has been treated for fibromyalgia since the amended alleged onset date." Doc. 8-3 at 28. For these reasons, the ALJ found that Ellick "does not have the medically determinable impairment of fibromyalgia." Doc. 8-3 at 28.

The ALJ also found that Ellick does not have an impairment or combination of impairments that meets or medically equals the severity of the impairments listed in the applicable Social Security regulations. Doc. 8-3 at 28.

The ALJ found further that the record "does not demonstrate neuro-anatomic (radicular) distribution of pain, paresthesia, or muscle fatigue consistent with compromise of the affected nerve root, along with radicular distribution of neurological signs present during physical examination or on a diagnostic test evidence by muscle weakness and signs of nerve root irritation, tension, or

compression, consistent with compromise of the affected nerve root, and either sensory changes evidenced by decreased sensation or sensory nerve deficit on electrodiagnostic testing, or decreased deep tendon reflexes." Doc. 8-3 at 28.

The ALJ found that "findings on imaging must be consistent with compromise of a nerve root in the cervical or lumbosacral spine, and this must result in impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following: (1) documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands; or (2) an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or (3) an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements." Doc. 8-3 at 28. The ALJ found that "the requirements of this section are not met" because, while Ellick alleged the use of a cane, "the treating and examining records and reports do not show that [Ellick] has a documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and

seated mobility device involving the use of both hands." Doc. 8-3 at 29.

The ALJ also found that Ellick's rheumatologist reported on October 3, 2024, that Ellick "was ambulating normally, as he had previously reported." Doc. 8-3 at 29. The ALJ found that Ellick's rheumatologist "also reported that [Ellick] had normal motor strength and no important large joint and small joint arthritis." Doc. 8-3 at 29. The ALJ found that Ellick's cervical spine x-rays "showed moderate C5-6 disc height loss and otherwise mild cervical degenerative spondylosis in January 2024," but that Ellick "has had consistently normal neurologic exams." Doc. 8-3 at 29.

The ALJ found further that Ellick does not meet or equal the criteria for systemic lupus erythematosus, undifferentiated and mixed connective tissue disease, or Sjogren's syndrome under the applicable regulations because Ellick "does not have involvement of two or more organs/body systems, with: one of the organs/body systems involved to at least a moderate level of severity; and at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss); or repeated manifestations of [these medical conditions], with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level: limitation of activities of daily living; limitation in maintaining social functioning; and limitation in completing tasks in a timely manner due to deficiencies in concentration,

persistence, or pace." Doc. 8-3 at 29.

The ALJ found that Ellick has a mild limitation in understanding, remembering, or applying information. Doc. 8-3 at 30. The ALJ found that Ellick alleged in a function report that she had difficulty remembering things, but that no memory limitations are shown in Ellick's medical records. Doc. 8-3 at 30.

The ALJ also found that Ellick has a mild limitation in interacting with others. Doc. 8-3 at 30. The ALJ found that Ellick did not indicate in her function report that she had difficulty getting along with others, but that Ellick did report that she did not socialize. Doc. 8-3 at 30. The ALJ found that Ellick's medical records show that she has consistently been described as cooperative. Doc. 8-3 at 30.

The ALJ found further that Ellick has a moderate limitation with regard to concentrating, persisting, or maintaining pace. Doc. 8-3 at 30. The ALJ found that Ellick's medical records show intact attention and concentration, and that at Ellick's consultative psychological examination her thought process was linear and logical. Doc. 8-3 at 30.

The ALJ found that Ellick has a mild limitation in adapting or managing oneself. Doc. 8-3 at 30. The ALJ found that Ellick's medical records have consistently shown that she has appropriate hygiene, grooming, and attire, and that she is alert and oriented. Doc. 8-3 at 30.

The ALJ then determined Ellick's residual functional capacity (RFC), finding

that Ellick could perform "light work" as defined in the regulations, except that she could not climb ladders, ropes or scaffolds; perform around hazards, or in concentrated exposure to extreme hot or cold temperatures, wetness, humidity or vibration; could understand, remember, and carry out simple, repetitive tasks; could maintain attention and concentration to those tasks for periods of two hours; and that any change in work setting should be no more than occasional and gradually introduced. Doc. 8-3 at 31.

In assessing Ellick's RFC and the extent to which her symptoms limited her function, the ALJ stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 8-3 at 31. The ALJ also stated that, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ "must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 8-3 at 31.

In finding Ellick's RFC, the ALJ considered information from Ellick's medical records and hearing testimony. Doc. 8-3 at 31–39. The ALJ considered

Ellick's function report, where she reported that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, understand, and use her hands. Doc. 8-3 at 31–32.

The ALJ considered Ellick's testimony that she used a cane that was prescribed in 2005 by a previous rheumatologist, and that she used the cane even around the house. Doc. 8-3 at 32. The ALJ considered Ellick's testimony that she had been diagnosed with fibromyalgia, Sjogren's syndrome, and rheumatoid arthritis by a previous rheumatologist, but that her current rheumatologist was not treating her for fibromyalgia. Doc. 8-3 at 32. The ALJ considered Ellick's testimony that she was only taking prescribed medications and was no longer using marijuana. Doc. 8-3 at 32. The ALJ considered Ellick's testimony that she recently had a lupus flare-up for the month of December and was unable to care for herself. Doc. 8-3 at 32. The ALJ considered Ellick's testimony that she normally had 8 to 10 days per month that she was sick in bed and unable to do anything, and that her condition affected her whole body, including her feet, legs, arms, and chest. Doc. 8-3 at 32.

After considering the record and subjective allegations, the ALJ found that Ellick's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but that Ellick's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons

explained in [the ALJ's] decision." Doc. 8-3 at 32.

The ALJ summarized the evidence underling the ALJ's decision, finding that the medical evidence shows that Ellick "has the above-stated residual functional capacity, which is consistent with [Ellick's] objective medical records and findings." Doc. 8-3 at 39.

The ALJ found that Ellick has been treated at Complete Health and was seen by Dr. John Morgan, a rheumatologist, on December 27, 2023, the amended alleged onset date. Doc. 8-3 at 32. The ALJ found that Dr. Morgan reported that Ellick reported "a continuing and perhaps increasingly difficult status with skin sores and associated symptoms," but that Ellick's physical exam showed her "to be in no acute distress and to be ambulating normally with a normal mental status, alert and with normal mood." Doc. 8-3 at 32. The ALJ found that Dr. Morgan completed an FMLA form during this appointment for Ellick's daughter, "indicating that he believed [Ellick's] daughter was needed to provide assistance for [Ellick]." Doc. 8-3 at 32. The ALJ found that Dr. Morgan reported that Ellick "looked well with appropriate concern but not uncontrolled toxicity or mental status abnormality in regular conversation on that date, and continued to report that at subsequent visits, which is not consistent with his statement that [Ellick] would need assistance from her daughter one to two days per week." Doc. 8-3 at 32.

The ALJ considered Ellick's emergency room records from January 19, 2024,

where she was seen after a motor vehicle accident. Doc. 8-3 at 33. The ALJ found that Ellick had a normal physical exam and was moving all extremities, with five out of five strength bilaterally with no motor or sensory deficits, and that she was alert, oriented, well appearing, and in no acute distress. Doc. 8-3 at 33. The ALJ found that Ellick was diagnosed only with acute cervical myofascial strain and contusion of chest wall, and that x-rays showed moderate C5-6 disc height loss and otherwise mild cervical degenerative spondylosis. Doc. 8-3 at 33.

The ALJ found that Ellick was seen at Complete Health by Dr. Morgan on January 26, 2024, where she reported continued problems in her hands, including arthritis and rash, as well as a rash on her lower extremities. Doc. 8-3 at 33. The ALJ found that Dr. Morgan reported that it did not appear that Ellick was requiring assistive devices and continued conservative care was in order. Doc. 8-3 at 33. The ALJ found that, other than Ellick's skin lesions, her physical exam "remained the same," and that Dr. Morgan "again reported that she looked well with no uncontrolled toxicity or mental status abnormality in regular conversation." Doc. 8-3 at 33.

The ALJ also found that on February 5, 2024, Ellick was seen by Julia Perkins, CRNP, at Complete Health for a follow-up after her motor vehicle accident. Doc. 8-3 at 33. The ALJ found that Ellick complained of neck, back, and right lower extremity pain. Doc. 8-3 at 33. The ALJ found that Ellick reported worsening

symptoms of lupus and was awaiting approval for infusion. Doc. 8-3 at 33. The ALJ found that Ellick's physical exam showed mild tenderness to palpation of the right shoulder radiating to the lateral neck, along with a faint expiratory wheeze in the upper lungs, but that Ellick's physical exam was otherwise normal. Doc. 8-3 at 33.

The ALJ found further that CRNP Perkins performed a health risk assessment on Ellick on March 1, 2024. Doc. 8-3 at 33. The ALJ found that Ellick reported that she had not felt anxious, depressed, irritable, sad, or downhearted and blue during the previous four weeks. Doc. 8-3 at 33. The ALJ found that Ellick reported that she had severe pain but that she could do "very heavy" physical activity for at least two minutes. Doc. 8-3 at 33. The ALJ found that Ellick reported that she could get to places out of walking distance, shop, prepare her own meals, do housework, handle money, and care for her personal needs without help. Doc. 8-3 at 33. The ALJ found that Ellick rated her health as poor and that "things had been going very bad for her during the past four weeks." Doc. 8-3 at 33. The ALJ found that Ellick reported that she was often falling or dizzy when standing up and that she was always tired and fatigued. Doc. 8-3 at 33. The ALJ found that Ellick was alert, cooperative, and in no distress. Doc. 8-3 at 33.

The ALJ found that Ellick was examined by Dr. Toma at Complete Health on July 10, 2024, where Ellick complained of pain in her left calf while walking for

about 10 minutes. The ALJ found that Ellick complained of situational anxiety and mild depression. Doc. 8-3 at 35. The ALJ found that Ellick was alert, cooperative, in no distress, and had a normal physical exam, with the exception of her left foot, where pulse could not be palpated. Doc. 8-3 at 35.

The ALJ also found that Ellick was examined by Dr. Robert Scott McCord on July 29, 2024, for left foot pain and left calf discomfort with ambulation. Doc. 8-3 at 35. The ALJ found that a review of systems was positive for joint pain, but negative otherwise, including negative for rash. Doc. 8-3 at 35. The ALJ found that Ellick was diagnosed with atherosclerosis of native arteries of extremities with leg pain. Doc. 8-3 at 35.

The ALJ found further that Ellick was seen by CRNP Perkins at Complete Health on August 19, 2024, where Ellick complained of cough and congestion, and on September 12, 2024, following an emergency room visit. Doc. 8-3 at 35. Ellick's physical exams were normal. Doc. 8-3 at 35.

The ALJ found that Ellick was seen by Dr. Morgan at Complete Health on October 3, 2024. Doc. 8-3 at 35. The ALJ found that Ellick had skin lesions but received an otherwise normal physical exam. Doc. 8-3 at 35.

The ALJ then found that Ellick's "statements about the intensity, persistence, and limiting effects of her symptoms are inconsistent with the medical records." Doc. 8-3 at 35.

The ALJ also found that Ellick's treatment records "have consistently shown [Ellick] to have normal motor strength and no important large joint and small joint arthritis." Doc. 8-3 at 36. The ALJ found that Ellick's "allegation at the hearing of severe and widespread skin lesions is also not shown in her treating medical records." Doc. 8-3 at 36. The ALJ found that Ellick's "treating medical records do not show disabling depression or anxiety, and [Ellick] has generally had normal mental status exams." Doc. 8-3 at 36. The ALJ found that Ellick's "physical exams have been normal despite her allegations of disabling pain and limitations," and that Ellick's medical records do not show any limitation in her ability to use her hands, do not show that she has disabling symptoms or limitations related to her liver disease, and do not show that she has had significant medication side effects. Doc. 8-3 at 36.

The ALJ found further that, while Ellick "has alleged significantly limited daily activities, she has reported the ability to engage in such activities as meal preparation, housework, driving, and shopping when she was not having a flareup of her symptoms." Doc. 8-3 at 37. The ALJ found that Ellick's "allegations of flareups at least once or twice a week is not consistent with her medical records, including those of her rheumatologist." Doc. 8-3 at 37.

The ALJ found that Ellick had a consultative examination with NP Washington in May 2024 that was "based on a solitary examination." Doc. 8-3 at

37. The ALJ found that, while "Ms. Washington's opinion was supported by her examination of [Ellick] and explanation, her opinion that [Ellick] could ambulate without assistance using a cane is not consistent with the [Ellick's] treating records which do not indicate that she requires the use of a cane." Doc. 8-3 at 37.

The ALJ also found that the "opinion of the State agency physicians that [Ellick] was able to perform a range of light work is also supported by explanation and their review of the evidence." Doc. 8-3 at 38. The ALJ found that only the limitations of "only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, crawling are not consistent with [Ellick's] medical records at the hearing level, and are not persuasive," because Ellick "has consistently had normal musculoskeletal and neurological examinations." Doc. 8-3 at 38.

The ALJ found further that Dr. Morgan completed an FMLA form for Ellick's daughter on December 27, 2023, reporting that Ellick's daughter was needed to provide assistance for her because she could not care for herself at times of significant illness. Doc. 8-3 at 38. The ALJ found that Dr. Morgan's opinion is not persuasive because his treating records do not show disabling symptoms or limitations as he described in the FMLA form. Doc. 8-3 at 38.

The ALJ then found that Ellick is unable to perform any of her past relevant work. Doc. 8-3 at 39.

After considering Ellick's age, education, work experience, RFC, and the

testimony of the VE, the ALJ found that Ellick could perform jobs that exist in significant numbers in the national economy. Doc. 8-3 at 40. The ALJ found that Ellick "has not been under a disability, as defined in the Social Security Act, from December 27, 2023, through the date of [the ALJ's] decision." Doc. 8-3 at 41.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards. Ellick argues in her brief that the ALJ's "reliance upon isolated portions of the record does not provide substantial evidence to support his conclusion regarding the Plaintiff's statements regarding the intensity, persistence and limiting effects of her pain." Doc. 11 at 16. But the ALJ properly assessed Ellick's subjective testimony regarding her impairments and associated symptoms, as the ALJ's decision was based on the multi-part "pain standard," and substantial evidence supports the ALJ's decision not to fully credit Ellick's subjective testimony regarding her symptoms.

### I. The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard." When a claimant attempts to establish disability through his own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies. That "pain standard" requires (1) "evidence of an underlying

medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also Raper v. Commissioner of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir. 2024); 20 C.F.R. §§ 416.929, 404.1529 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [her] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled." 20 C.F.R. §§ 416.929(c)(4), 404.1529(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, in analyzing Ellick's RFC, the ALJ stated that the ALJ "must follow a two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 8-3 at 31. According to the ALJ, where the claimant's statements about the intensity, persistence, or limiting effects of symptoms were not substantiated by objective

medical evidence, the ALJ "must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 8-3 at 31.

The ALJ then applied the two-part test and found first that Ellick's medically determinable impairments could reasonably be expected to cause the alleged symptoms. Doc. 8-2 at 32. The ALJ then found second that Ellick's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Doc. 8-2 at 32. Thus, the ALJ's decision was based on the proper legal standards.

## II. Substantial evidence supports the ALJ's decision to partially discredit Ellick's subjective testimony regarding her impairments and associated symptoms.

Furthermore, substantial evidence supports the ALJ's decision not to fully credit Ellick's subjective testimony regarding her impairments and associated pain and symptoms.

### A. The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony. *Wilson*, 284 F.3d at 1225. A claimant can establish that he is disabled through his "own testimony of pain or other subjective symptoms." *Dyer v. Barnhart*, 395 F.3d 1206,

1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements." 20 C.F.R. § 416.929(c)(2); 20 C.F.R. § 404.1529(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of her symptoms, the ALJ must consider all of the evidence, objective and subjective. 20 C.F.R. § 416.929; 20 C.F.R. § 404.1529. Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, her precipitating and aggravating factors, her daily activities, the type, dosage, and effects of her medications, and treatments or measures that she has to relieve the symptoms. *See* 20 C.F.R. § 416.929(c)(3); 20 C.F.R. § 404.1529(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [her] symptoms." *See* 20 C.F.R. § 416.929(c)(4); 20 C.F.R. § 404.1529(c)(4). If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar). "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer*, 395 F.3d at 1210 (quotation marks and alterations omitted).[1] "The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

**B. The ALJ properly explained the decision not to fully credit Ellick's subjective testimony regarding her symptoms, and substantial evidence supports that decision.**

The ALJ properly explained the decision to partially discredit Ellick's

---

[1] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting Social Security Ruling 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

subjective testimony regarding her pain and symptoms, and substantial evidence supports the ALJ's decision.

In her brief, Ellick argues that the "ALJ's determination that the Plaintiff's daily activities are inconsistent with her allegations of debilitating pain and limitation is not supported by substantial evidence." Doc. 15 at 12.

But the ALJ considered the record as a whole, and substantial evidence supports both the ALJ's finding that Ellick's testimony was not consistent with the record evidence and the ALJ's RFC finding of light work with limitations.

The ALJ made an explicit finding that Ellick's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." Doc. 8-3 at 32. The ALJ provided a detailed analysis of the record medical evidence, taking into consideration Ellick's treatment records and consultative examinations. Doc. 8-3 at 32–39.

The ALJ considered "the evidence in its entirety." Doc. 8-3 at 32. The ALJ considered that "Dr. Morgan reported that [Ellick] looked well with appropriate concern but not uncontrolled toxicity or mental status abnormality in regular conversation on [December 27, 2023], and continued to report that at subsequent visits, which is not consistent with his statement that [Ellick] would need assistance from her daughter one to two days a week." Doc. 8-3 at 32. The ALJ considered

Ellick's health risk assessment performed on March 1, 2024, where Ellick reported that she could perform very heavy physical activity for at least two minutes and could get to places out of walking distance, go shopping for groceries and clothing, prepare her own meals, do housework, handle her personal care needs, and handle money without help. Doc. 8-3 at 33.

The ALJ also considered that Ellick's "treatment records have consistently shown [Ellick] to have normal motor strength and no important large joint and small joint arthritis." Doc. 8-3 at 36. The ALJ considered that on "many occasions . . . [Ellick's] physical exams have been normal despite her allegations of disabling pain and limitations." Doc. 8-3 at 36. The ALJ also found that Ellick's "medical records do not show that she has any significant flares once or twice a week or pain preventing her from engaging in work activity consistent with the above-stated residual functional capacity." Doc. 8-3 at 37.

The limitations placed on Ellick's RFC to perform light work show that the ALJ partially credited Ellick's subjective testimony when finding her RFC. Ellick testified that she uses a cane "on a regular basis, especially due to [her] legs being with the poor circulation in it." Doc. 8-3 at 52. Ellick also testified that, when she was working, "it was hard for [her] to concentrate" from pain. Doc. 8-3 at 61. In limiting Ellick's RFC, the ALJ found that Ellick could "not climb ladders, ropes, or scaffolds; perform around hazards, or in concentrated exposure to extreme hot or

cold temperatures, wetness, humidity, or vibration." Doc. 8-3 at 31. The ALJ also limited Ellick's RFC by finding that Ellick "can understand, remember, and carry out simple, repetitive tasks, and maintain attention and concentration to those tasks for periods of two hours." Doc. 8-3 at 31.

Further, "[t]he residual functional capacity is an assessment based upon all of the relevant evidence of a claimant's remaining ability to do work despite his impairments." *Lewis*, 125 F.3d at 1440. And, according to Social Security Ruling 96-8P, "RFC is not the least an individual can do despite his or her limitations or restrictions, but the *most*." 1996 WL 374184, at *2 (July 2, 1996) (emphasis in original).

In this regard, the ALJ's decision considered information based on both objective and subjective evidence, accounting for evidence supporting Ellick's testimony, while also clearly identifying evidence calling into doubt Ellick's subjective testimony about the intensity, persistence, and limiting effects of her symptoms. *See* 20 C.F.R. § 416.929; 20 C.F.R. § 404.1529.

Thus, the ALJ's decision and RFC finding included the necessary "explicit and adequate reasons" for partially discrediting Ellick's subjective testimony about her symptoms. *Wilson*, 284 F.3d at 1225. The ALJ "considered [Ellick's] medical condition as a whole," and the decision was not just a "broad rejection" of Ellick's subjective testimony. *Dyer*, 395 F.3d at 1210.

Substantial evidence requires "such relevant evidence as a reasonable person would accept as adequate to support a conclusion" (*Crawford*, 363 F.3d at 1158), and the court must affirm an ALJ's factual findings if they are supported by substantial evidence, "[e]ven if the evidence preponderates against the Commissioner's findings" (*Crawford*, 363 F.3d at 1158–59 (quoting *Martin*, 894 F.2d at 1529)). This court cannot reweigh the evidence (*see Winschel*, 631 F.3d at 1178), and there is sufficient evidence in the record to support the ALJ's findings that Ellick's testimony regarding her symptoms was not consistent with the record as a whole and that Ellick was able to perform light work with limitations (based on Ellick's own testimony).[2] Accordingly, substantial evidence supports the ALJ's

[2] As a final note, at the end of her brief, Ellick includes—without development—a bare assertion that the ALJ did not fully and fairly develop the record. Doc. 15 at 15. But that is not the case. An ALJ "has a basic duty to develop a full and fair record." *Henry v. Commissioner of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015). However, the claimant ultimately "bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *see also* 20 C.F.R. § 416.912(a) ("[I]n general, you have to prove to us that you are . . . disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are . . . disabled."). And, notwithstanding the ALJ's responsibility to develop a "full and fair" record, "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded." *Graham v. Apfel*, 129 F.3d 1420, 1422–23 (11th Cir. 1997). The Eleventh Circuit has instructed that "[t]he court should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Graham*, 129 F.3d at 1423 (quotation marks omitted). Here, Ellick has provided no basis for the court to find prejudice and the record contains no clear evidentiary gaps; therefore, Ellick has not shown that the ALJ failed to fully and fairly develop the

decision. The ALJ clearly articulated a credibility finding that was supported by substantial evidence, and the court cannot disturb that finding. *See Foote*, 67 F.3d at 1562.

**CONCLUSION**

For the reasons stated above (and pursuant to 42 U.S.C § 405(g)), the Commissioner's decision is **AFFIRMED**. The court separately will enter final judgment.

**DONE** and **ORDERED** this September 15, 2026.

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE

record.